R. L. PATTIE, ELTON W. GOOD, WALDO MOBERLY
AND ROBERT M. ANDERSON, PLAINTIFFS AND RESPOND-
ENTS, *v.* OIL AND GAS CONSERVATION COMMISSION
OF THE STATE OF MONTANA, DEFENDANT AND APPELLANT.

No. 10827.
Submitted March 11, 1965. Decided June 7, 1965.
402 P.2d 596.

532

John H. Risken (argued), Helena, for appellant.

Jardine, Stephenson, Blewett & Weaver, John D. Stephenson, Jr. (argued), Alex Blewett, Jr. (argued), Great Falls, for respondents.

MR. CHIEF JUSTICE JAMES T. HARRISON delivered the Opinion of the Court.

This action arose out of plaintiffs' dissatisfaction with an order made by defendant, Oil and Gas Conservation Commission, hereinafter called Commission, denying a request to drill a gas well at a place other than that prescribed by the spacing requirements.

The plaintiff-respondents, Pattie and others, are oil and gas lessees of the W½ of Section 14, T. 37 N., R. 3 E., Toole County, Montana. The Sumatra Oil Corporation also has leases in this vicinity including the NE¼ of Section 15, which is immediately to the west of respondents' lease.

Sumatra filed a notice of intention to drill an oil well in the SE¼NE¼ Section 15 at a point 330 feet west of the section boundary separating the Sumatra lease from the Pattie lease. Rule 203(b) of the General Rules and Regulations of the Oil and Gas Conservation Commission provides that when drilling for oil the well location shall be no closer than 330 feet from any legal subdivision line and no closer than 1,320 feet from any other well producing from the same reservoir. The Com-

mission rules further provide that gas wells are to be more sparsely located over the reservoir—at least 1,320 feet from a lease or property line and not less than 3,700 feet from a neighboring gas well on the same reservoir. Rule 203(c). These rules apply in the absence of special field rules. Special field rules are promulgated after a field is developed and usually are tailor-made to fit the requirements of the specific reservoir. The above rules are merely the general spacing rules that have been arrived at by statistical studies of many oil and natural gas fields, reservoirs, and pools.

Instead of hitting oil as planned Sumatra struck natural gas in commercial quantities. Since this was a newly discovered gas field no special field rules were in effect, so the provisions of Rule 203(c) were applicable. As a gas well the Sumatra well was clearly in violation of the general spacing rules. Sumatra applied to the Commission to have either special field rules or the rule of 203(c) established as the spacing rules for the newly discovered gas field. Included in that application was a request that their gas well be declared an exception to the rules so that time and money would not be lost in having to drill anew.

Respondents, Pattie and others, applied for an exception also, and requested permission to drill an off-set to the Sumatra well in Section 15. This would place the requested well 330 feet from the Section 14-15 boundary line and 660 feet from Sumatra's well.

On September 13, 1962, the Commission held the hearing and declared the field to be called the Whitlash West Field. Spacing of gas wells was prescribed to be on the basis of one well per 160 acre unit (quarter section) located within a 660 foot square in the center of each such 160 acre unit.

The testimony, based upon known geological factors established by known producing oil wells and dry holes, was that the likely eastern edge of the gas reservoir follows a line from the center of Section 11 southwest to the center of Section 22. The

field may be roughly sketched as a slender oval extending from the center of Section 21 to the center of Section 11; the western line passes through the northwest corner mark of Section 15 and just to the east of the center of the dividing line between Sections 14 and 15. The Sumatra well, in the SE¼NE¼ Section 15, lies inside the eastern edge of the reservoir. If plaintiffs are granted their off-set, their well will be in the SW¼NW¼ of Section 14, or just inside the eastern edge of the new field. If, however, plaintiffs' request is denied they will have to drill at the center of the NW¼ of Section 15 (within a 660-foot square, allowed for tolerance). This position lies just outside the projected eastern edge. The Commission granted Sumatra the requested exception for the well already drilled but plaintiffs were denied permission to drill the off-set.

Plaintiffs did not apply to the Commission for a rehearing as may be done under section 60-134, R.C.M.1947, but filed a complaint directly in the district court of Toole County for a trial de novo as provided for in section 60-135, R.C.M.1947.

The complaint alleged that the order of the Commission was unreasonable and inequitable in that it causes plaintiffs injury by gas being drained from under their land without their being able to protect themselves with a well. It was asserted that to allow them to drill the off-set would not be damaging to the conservation protection sought by the spacing units.

Testimony was received and the matter was finally submitted to the court on motions for summary judgment filed by both sides on February 26, 1964. In April 1964, District Judge R. V. Bottomly denied the Commission's motion, granted plaintiffs' motion, and ordered the Commission to reconsider plaintiffs' request. The Commission was found to possess the authority and duty to adjudicate correlative rights and was instructed to take them into consideration in the redetermination of the matter. Plaintiffs were adjudged entitled to an order that would either give them their share of the gas or compensation for that amount.

The Commission brings this appeal and urges three groups of error. It is argued that the plaintiffs failed to exhaust their administrative remedies before bringing the action in the district court. Secondly, the contention is made that the Commission lacks jurisdiction to determine correlative rights or private rights because there is no authorization to do so provided by the legislature. Finally, the Commission asserts that plaintiffs' presented no evidence to the Commission to justify their requests for permission to drill the off-set outside the spacing unit.

We shall proceed to a discussion of the second contention since it would appear to be the determinative issue on this appeal.

This group of specifications of error deal with the lower court's holding that the Commission has the authority and duty to adjudicate the correlative rights of the parties.

Plaintiff's request for an exception to the well spacing regulations was denied because the Commission felt that it could not consider the correlative rights or private interests of the parties in making the field rule order. The reason given for this view is the absence of any reference to "correlative rights" in the Montana Oil and Gas Conservation Act, sections 60-124 to 60-148, R.C.M.1947.

The term "correlative rights" has been variously defined to mean those rights of each landowner, lessee, or operator in the common source of petroleum. The rights are limited by corresponding duties to the neighboring operator. The duties are to not take an undue amount of the petroleum or to do injury to the common supply. Operation and production is to be carried on only in such manner or amount as not to harm the rights of the others. As it applies in this action, correlative rights would mean the interest of plaintiffs in securing a portion of the natural gas underlying their lease. Their opponent is the Commission rather than an adjacent owner, but the

right to a share of the common supply is still in issue. Sullivan, Handbook of Oil and Gas Law, 1955, § 145.

As is pointed out by plaintiffs, some Conservation Acts direct the conservation agency to protect the private rights and interests of the parties expressly in the Act. Other states have Acts that include "correlative rights" in the statutory definition of "waste," and others make reference to the term in the policy declaration. Cf. Vernon's Tex.Stats.1948, Title 102, Art. 6008, § 1; Mason's Mich.Supp., Stats.1948, § 319.1; Utah Stats.1953, §§ 40-6-1; and Colo. R.S.1963, § 100-6-1.

■■ Montana's Act makes no reference to "correlative rights." Some other states also make no reference to the term in their acts but study of the statutes of those states demonstrates that there are many objectionable features of those Acts simply due to the fact that those states produce only small amounts of petroleum and the legislatures of those states have not been pressured into providing extensive legislation. Comment, 30 Miss.L.J. 1 (1958). Montana is the only state we can find that produces substantial quantities of oil and gas, has a modernized Conservation Act, and belongs to the Interstate Oil Compact Commission, but has no specific reference to correlative or private rights in the legislation. This case is truly unique. No similar cases have been found and no oil and gas law treatise or other writing has been found disclosing to us a guide for the solution. Unless the Montana Act is flexible enough to permit the Commission to make orders with an eye to the interests of adjacent landowners in sharing in the common supply the legislation would have to be held unconstitutional as a deprivation of property without due process of law as happened in California. Bernstein v. Bush, 29 Cal.2d 773, 177 P.2d 913; Braly v. Board of Fire Commissioners, 157 Cal. App.2d 608, 321 P.2d 504. Conservation legislation is an action of the police power, and in order to sustain it as a reasonable regulatory measure it is necessary that the public's interest in preserving the natural resource be balanced with the land-

538

owner's interest in developing and selling it. Cities Service Gas Co. v. Peerless Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190; A.B.A. Section of Natural Resources, Conservation of Oil and Gas 1948-1958, pp. 339-40. The interests of both the public and the landowners must be considered although the particular legislation may emphasize one over the other.

"In many of the cases * * * the courts have supported the constitutionality of conservation statutes partly on the ground that a state may exercise its police power to protect the interest of the public in oil and gas as natural resources and partly upon the ground of protecting the correlative rights of the owners of land in a common source of supply. In some of them the interest of the public is stressed, while in others the protection of correlative rights is stressed, but in none of them can it really be said that either basis for the exercise of the police power is entirely overlooked." 1A Summers, Oil and Gas, § 106 n. 44, p. 188.

In the instant case, the Commission did not consider the correlative rights but we hold that it should have. The transcript shows that plaintiffs attempted to convince the Commission that if they were confined to drilling in the center of the NW¼ of Section 14 (with tolerance) the result would be either no gas or less gas than Sumatra would produce. A considerable portion of the plaintiff's lease, however, overlies the projected boundary of the gas reservoir. Plaintiffs desired either a well over the reservoir or a share of the production from the Sumatra well. Of course, in order for plaintiffs to arrange for a share of the production from the Sumatra well an agreement with Sumatra would have to be created. R.C.M. 1947, § 60-131. Permission to drill, on the other hand, is administered by the Commission, and it is this desire of plaintiffs that we are deciding here.

Section 60-129, subd. C, provides:

"Subject to the provisions of this act, the order establishing spacing units shall direct that no more than one (1) well

shall be drilled and produced from the common source of supply on any spacing unit, and that the well shall be drilled at a location authorized by the order, with such exception as may be reasonably necessary where it is shown, upon application, notice, and hearing, and the commission finds, that the spacing unit is located on the edge of a pool or field and adjacent to a producing unit, or, for some other reason, the requirement to drill the well at the authorized location on the spacing unit would be inequitable or unreasonable."

■■ Where, as here, the landowners lie on the projected edge of a petroleum reservoir the section above clearly indicates that an exception may be granted where "the requirement to drill the well at the authorized location on the spacing units would be inequitable or unreasonable." Certainly, the Commission would not say that in determining where the authorized location is "inequitable" or "unreasonable" it is confined to a scientific waste prevention study alone. The correlative rights of the parties as a general principle of conservation of natural resources must also be considered in studying the equities of the well-spacing regulations with respect to fringe owners. It is the very essence of "conservation" that the private rights be respected. Counsel for the Commission make frequent reference in the brief to the fact that plaintiffs only presented a case showing that the "equities" are on their side. But this is what the section quoted above demands.

It has always been our understanding that the whole purpose of oil and gas conservation legislation is to provide protection to the citizens of a state against the wasteful depletion of the petroleum resources and also to secure to the landowners their rights to produce and sell the petroleum. Sullivan, Handbook of Oil and Gas Laws, 1955, § 136.

In order to avoid the unrestricted and indiscriminate drilling and production of petroleum brought on by the Rule of Capture theory and the Off-set Drilling Rule theory the various conservation acts qualify those theories by entrusting to an

agency the authority to study a reservoir scientifically, economically, and legally and to "police" the operations for the benefit of the people and the landowners. 1 Summers, Oil and Gas, Sections 63, 106; Ohio Oil Company v. State of Indiana, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729.

The Ohio Oil Company case is taken as the first case wherein correlative rights were recognized as one of the three bases of petroleum conservation legislation. The prevention of physical waste, the prevention of economic waste, and the protection of correlative rights are often taken as the three bases for the legislation. These three things need not be mentioned in the legislation. For example, no Indiana law referred to "correlative rights" but it was because the Supreme Court of the United States was able to see the protection of those rights as the intent and purpose of the Indiana law in issue that the law was sustained as constitutional. Likewise we think it is manifest that the legislature of Montana intends the private rights of the landowners be considered by the Commission. The consideration of correlative rights and other private rights of the landowners insofar as spacing and regulatory orders and requirements are concerned is a power necessarily arising by implication from the legislation.

Section 60-129 (C) is sufficiently broad to permit the Commission to consider private rights in making orders. In its conclusion of Law V the lower court implies that it feels the Commission has the power to adjudicate correlative rights. We modify that to mean only that the Commission has the authority and duty to consider correlative rights and private interests in making regulatory orders, but it does not have the authority to adjudicate disputes involving those rights. In Bacus v. Lake County, 138 Mont. 69, 354 P.2d 1056, this court recently held that in order for an administrative agency to have the authority to perform specified quasi-judicial functions it is necessary for the legislation to include a policy or statement of standards expressly defining that authority. That

ruling is controlling here. Correlative rights disputes between adjacent landowners must still be disposed of by civil action in the district courts. There the common law oil and gas law principles are applicable, and correlative rights between adjacent owners is a common law principle. Sullivan, Handbook of Oil and Gas Law, 1955, Section 141.

██ It would be "inequitable" and "unjust" not to allow one to have an exception to the drilling pattern in order to allow that driller to get his share of petroleum—provided, of course, that the exception does not cause waste.

The lower court was correct in ordering the Commission to reconsider the petition of the plaintiffs-respondents taking into account the correlative rights of the plaintiffs.

In view of this holding we will not undertake to discuss the appellant's first and third group of specifications of error except to say that with the Commission taking the position that it could not consider the correlative rights of the parties it is understandable why plaintiffs did not request a rehearing. The Commission's order was based on its determination of a point of law, not on a question of fact. The Commission having decided that they lacked the authority to consider correlative rights it is difficult to grasp what benefit a rehearing would have been since they maintained the same position here on this appeal.

The Commission's argument that the evidence was insufficient is based on the same premise, but that picture has changed.

The order of the district court is affirmed.

MR. JUSTICES JOHN C. HARRISON, ADAIR, DOYLE and CASTLES concur.